ROY M. HAMMOND AND WALTER F. EVERLY, D/B/A
HAMMOND-EVERLY ENGINEERING COMPANY, PLAINTIFFS AND
RESPONDENTS, v. IGNATIUS J. KNIEVEL, ALSO KNOWN AS
I. J. KNIEVEL, EMMA F. KNIEVEL, ALSO KNOWN AS
EMMA FRANCES KNIEVEL, AND KNIEVEL IMPORTS,
INC., A CORPORATION, DEFENDANTS AND APPELLANTS.

No. 10426.
Submitted November 13, 1962. Decided January 30, 1963.
378 P.2d 388.

434

Corette, Smith & Dean, Doepker & Hennessey, Kendrick Smith (argued orally), Maurice F. Hennessey (argued orally), Butte, for appellants.

John T. Mullany (argued orally), Butte, for respondents.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is an appeal by the defendants from a judgment for the plaintiff in an action to foreclose a mechanic's lien.

The action was brought in the district court for Silver Bow County by the plaintiff-respondent, Hammond-Everly Engineering Co., hereinafter referred to as plaintiff, against Ignatius J. Knievel, hereinafter referred to as defendant, and Emma Frances Knievel, his wife.

In 1956, Emma Frances Knievel was the owner of property situated at 112 Galena Street, Butte, Montana, and also the lot adjacent thereto. At that time, defendant was the duly authorized sales representative for Volkswagen automobiles. Defendant's sales and service facilities were limited at that time, and accordingly he was under pressure from the factory representative to expand his facilities.

The lot adjacent to 112 Galena Street was vacant except for the remains of a building destroyed by fire many years previous. The lot sloped from front to rear with almost a one story differential between the two.

Defendant conceived the idea of constructing a structure that would have a street level sales floor, and repair facilities in the basement with access to the latter from the alley. Because of the cost involved, defendant decided to get by with a temporary structure at street level built on the roof-deck of the basement garage.

Defendant contacted Elmo A. Briggs of Butte for the purpose of getting an estimate of the cost to construct such a structure with a 32 by 50 foot sales room on the street level. The method of construction contemplated at that time involved the use of many supporting posts. An estimate of $31,285 was submitted by Mr. Briggs on September 5, 1956.

Defendant on his own initiative, also contacted Montana Concrete Industries, Inc., concerning the use of pre-stressed concrete planks. Such use would greatly reduce the number of supporting members, and thereby increase the usable area of the basement garage. Through Montana Concrete Industries, Inc., defendant had Norman J. Hamill, an architect, make a preliminary rough sketch of the proposed structure.

In November 1956, two months after the Briggs' estimate, defendant first contacted the plaintiff concerning the possibility of their doing the construction work. Following that first meeting there were several meetings in which certain changes were discussed and during which the defendant abandoned the idea of constructing a temporary building at street level. Defendant's plan at that time contemplated using the roof of the garage as an open sales area.

Plaintiff testified that in December of 1956, a cost plus ten percent contract was being formulated between the parties at an estimated cost of $32,500. This was an oral estimate.

On January 19, 1957, plaintiff forwarded a letter to the de-

fendant reciting therein an estimated cost of $22,750 exclusive of certain extras. Plaintiff's testimony is that the only purpose of the letter was to help defendant deceive a bank as to the actual cost of the proposed building, and that the defendant was to pay additional money over and above the estimated cost mentioned in the letter. The defendant denies this. Defendant's uncontradicted testimony is to the effect that this letter was never shown to any bank. Further, plaintiff applied for a building permit from the City of Butte for a building of the value of $18,000 to $20,000 and no change was ever made in the permit to reflect a higher cost.

Plaintiff asserts that the final contract, on a cost plus ten percent basis, was agreed upon by the parties about March 28, 1957. Defendant denies the existence of such contract.

Defendant contends that much of the difficulty stems from the fact that the plaintiff firm is a mining engineering firm. Even if this were so, it was the defendant who contacted the plaintiff to do the job. Moreover, plaintiff testified to extensive prior construction experience involving concrete works. From the extensive list of clients, it is obvious that the plaintiff has had considerable experience in the construction field.

On April 17, 1957, before construction had begun on the new structure, a small fire damaged a portion of the existing building located at 112 Galena Street. Defendant asked the plaintiff to make certain repairs and also to make certain structural changes in the building to facilitate entrance to the new building. No method of payment or agreement as to cost was made at that time. Later an estimate of the cost of repairing the fire damage was presented to the defendant, and the amount thereof was paid over to the plaintiff following a recovery on the fire insurance policy.

On April 18, 1957, construction work began. The first work necessary was the removal of an old concrete floor remaining from the ruins. Thereafter, footings were laid, and fol-

lowing that walls and columns were added. Thereafter the pre-stressed concrete planks were placed, and then the roof itself was poured and bonded to the pre-stressed planks.

The defendant admitted that certain extra work not previously contemplated became necessary as the work progressed. It was found necessary to remove considerable more of the old floor than was originally contemplated. Erosion was found to have materially weakened the sidewalk in front and the curbing as well. These had to be replaced with new materials. A wall existing on the premises was considered as a possible support for the concrete plank, but the wall was found to have suffered damage by the lateral pressure of the adjoining soil, in fact it caved in during the construction work. This wall had to be torn down, hauled away and a new one constructed to take its place.

On July 15, 1957, while work was still progressing, the plaintiff submitted estimate number one, which included costs up to July 1. This estimate was for an amount of $27,790.60, and at that time the defendant paid the plaintiff $10,000.

Sometime in November 1957, the plaintiff finished the job and removed all tools, equipment and workers from the premises.

On December 3, 1957, plaintiff submitted "estimate number 3" which indicated an additional $12,645.22 was owing. The entire balance due as of that estimate was $30,435. That same day an estimate for the fire repair damage in the amount of $781.97 was prepared. In January 1958, plaintiff received the check for $781.97. No further payment has been received from the defendant, although the defendant has tendered the sum of $19,848.35 which sum represents the claimed balance due on the alleged "contract" sum plus payment for the admitted extras.

There is no dispute that the basement was not fit for use. The concrete slab poured over the pre-stressed concrete planks expanded more than the plaintiff allowed for and as a result

the roof leaked at the expansion joints and also through other cracks which developed in the concrete. Moreover concrete is not impervious to water, and moisture condensation also added to the water dripping through the roof. Plaintiff asserts that the leaking is a natural result of the type of construction use, and that the defendant had repeatedly vetoed suggestions that the deck be covered with some impervious material. Defendant counterclaimed for damages for loss of use.

The court below denied damages for loss of use and ruled in the plaintiff's favor on the counterclaim.

Following completion, the defendant complained often about the leaking, but was unable to reach the plaintiff, because as the plaintiff explains he was on a construction project in Yellowstone National Park.

In July and August of 1958, plaintiff sent out two workers to repack the expansion joints with a more elastic material, and also to fill the other cracks with a waterproofing material. In August of 1958, plaintiff sent the defendant another bill for the construction which did not include the repair work done at that time.

After counsel had been obtained, the plaintiff sent out another bill adding in the cost of the repairs to the roof. Thereafter the mechanic's lien in question was filed.

Defendant contends that the plaintiff had padded the bill, and there was certain evidence to bear this out. The final estimate included parts and labor which the plaintiff admitted were used for the fire repair, and as noted above, that separate bill had been paid. Plaintiff also included a surcharge to the hourly rate for the laborers for "transportation and small tools", which was practically unsupportable as a cost item for this particular job. Likewise the charge of $1,850 for "engineering design and supervision" was not adequately proved.

Defendant introduced into evidence two cost estimates from

other construction firms in Butte to build a structure similar to that built by the plaintiff. One estimate was for $19,349 and the other for $18,486.25. Both estimates excluded the extra items which the defendant admits he is liable for. The value of such *de facto* estimates is decreased by the fact that both did not understand fully the problems involved in the job, and further they both under-estimated the net cost of materials. However they do show an astonishing discrepancy between the cost here asserted by the plaintiff. The defendant's contention that the plaintiff charged defendant gross while paying net for certain items is not supportable since there was no proof that the plaintiff was able to get any discount upon such items.

The district court found that the plaintiff and the defendant had entered into a cost plus ten per cent contract, and that there was a continuous and open account from April 1957 to August 1958.

The defendant specifies error by the district court in permitting testimony to be introduced to vary the terms of a written contract over his objections; also in finding a continuous and open account following the conclusion of the construction work.

Considering the first specification of error, while it is a correct statement of law that a written contract cannot be varied by parol testimony, it is a well-established exception that parol evidence may be introduced to show that what appears to be a written contract on its face is in fact, no contract at all. Section 93-401-13, subd. (2), R.C.M.1947. See Platt v. Clark, 141 Mont. 376, 378 P.2d 235.

In the instant case, plaintiff testified that the letter was not intended to be a valid contract between the parties. Such testimony is not unsupported. The actions of the parties are entirely consistent with a cost plus ten per cent contract, and entirely inconsistent with a set amount contract as the defendant contended.

 The rule has been frequently stated that in equity cases, the findings of fact of the district court, sitting without a jury, and when supported by the evidence will not be disturbed on appeal. See Duval v. Fuchs, 141 Mont. 123, 375 P.2d 541. There is evidence to support this finding of the district court, and we will therefore not disturb it.

██ With regard to the defendant's second specification of error that the district court erred in finding an open account through August 1958, the majority of this court believes that this case is controlled by the rule enunciated in Caird Engineering Works v. Seven-Up Gold Mining Co., Inc., 111 Mont. 471, 111 P.2d 1267. That rule is, whether there is or is not an open account is a question of fact, and the decision of the district court is presumed to be correct when supported by the evidence.

The most recent case involving a finding by the district court that an open account existed is Walsh-Anderson Co. v. Keller, 139 Mont. 210, 217, 362 P.2d 533, 537. In that case we said.

"We realize that we are dealing with a gray area of the mechanic's lien law in the instant case. However, under the specific' facts and circumstances involved here, the delivery of the plywood sheets, which were charged out on July 29, 1958, [by the owner] extended the time within which the plaintiff could file its mechanic's liens. In so concluding, we have considered the type of agreement between the plaintiff and Keller, the absence of bad faith in delivering the plywood sheets, and the fact that the defendants Storm and Tynes are not innocent grantees. Further cases in this area must be dicided on their own specific facts."

██ A majority of my brethren feel that the instant case is not an extension of the rule announced in the Walsh-Anderson case, supra, but falls well within the outside limits delineated by that case. In the instant case, the plaintiff entered to repair a clearly unusable structure at the insistence of

the defendant, certainly this "enhanced" the property. Because the property was unusable, and because the property was "enhanced", a majority hold that an open account existed. My personal view is to the contrary but in preparing this opinion for the court I yield to the views of my associates.

Section 45-502, R.C.M.1947, provided that a mechanic's lien must be filed within ninety days following the completion of labor or the supplying of material *unless* there exists an open account between the parties, in which case the lien may be filed within ninety days of the last transaction between the parties.

Since the district court found that an open account existed up to the time the repair work was done in 1958, then the lien was filed within ninety days of the last item as the statute provides. Therefore the lien is valid.

As pointed out earlier in this opinion, there were certain indications that the plaintiff had padded the bill. An examination of the record presented to this court showed a total of nearly $4,000 which was unsupportable as cost items on a cost plus ten percent contract. For this reason, we order that the case be remanded for an accounting to determine the actual amount of the lien.

While it superficially appears that the plaintiff deliberately padded the bill, there is no proof that this was done with an intent to defraud the defendant. Therefore, we need not invoke the rule enunciated in Duval v. Fuchs, 141 Mont. 123, 375 P.2d 541, in which case a plaintiff found guilty of fraud lost his right to a mechanic's lien by virtue of the fraud therein.

The cause is remanded for further proceedings consistent with this opinion, costs to be assessed as per statute.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR JUSTICES CASTLES, DOYLE and ADAIR concur.